**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| BED-EX, INC. | § | |
|     *Plaintiff* | § | |
| | § | |
| v. | § | Civil Action No. 5:13-cv-00573-HLH |
| | § | |
| ALIMED, INC. and | § | |
| WHITE STAR MEDICAL, INC. | § | |
|     *Defendants* | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, BED-EX, INC., Plaintiff in the above titled and numbered cause, complaining of and about ALIMED, INC., Defendant, and files its Second Amended Complaint and would respectfully show the Court the following:

## I.
## PARTIES

1.      Defendant, ALIMED, INC. (hereinafter "ALIMED"), is a corporation, organized under the laws of Massachusetts, with its principal place of business in Dedham, Massachusetts, doing business in Texas without a registered agent of service.  Alimed has appeared herein and through its attorney of record, Les Katona, Jr, Cavaretta, Katona & Francis, PLLC, 700 N. St. Mary's Street, Suite 1500, San Antonio, Texas 78205.

2.      Defendant, White Star Medical, Inc. (hereinafter "WHITE STAR"), is a corporation that is incorporated under the laws of the State of Texas. Defendant has its principal place of business in the State of Texas. Defendant may be served with process by serving its registered agent, Frank A. Forcelli at 10626 Gulfdale D#4, San Antonio, Texas 78216.

3.      Plaintiff, Bed-Ex, Inc. (hereinafter "BED-EX") is a corporation organized under the laws of the state of Delaware with its principal place of business in San Antonio, TX.

## II.
## VENUE

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. Minimum Annual Royalty payments under the parties' agreement were to be performed in Bexar County, Texas. Further, venue in a patent infringement case includes any district where there would be personal jurisdiction over the corporate defendant at the time the action is commenced. **VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1583 (Fed. Cir. 1990)**.

## III.
## FACTS

5.      Plaintiff is the owner of the U.S. and Foreign Patents and Patent Applications identified in the Appendix A to Exhibit "A" attached hereto (the "PATENTS") for inventions generally and collectively described as "Modular Systems for Monitoring the Presence of a Person Using a Variety of Sensing Devices".

6.      In exchange for valuable consideration, Plaintiff and Defendant AliMed entered into a License Agreement ("Agreement"), Exhibit "A" whereby Defendant would pay royalties, make such capital investments as it deems necessary, and carry out the manufacture, distribution and sale of certain products covered by the PATENTS.  Further, Defendant agreed to pay Plaintiff a Minimum Annual Royalty ("MAR") according to the Schedule of Minimum Annual Royalties set forth in the APPENDIX D to the AGREEMENT.

7.      Then, on September 5, 2012, Defendant AliMed issued an unsigned letter alleging breach on the part of the Plaintiff and that the Agreement would be terminated immediately if there was

a breach and that the correspondence was to provide ninety days' Notice of termination should there be no breach.

8.     Plaintiff responded on October 20, 2012 clarifying and explaining that there was no breach on the part of the Plaintiff; providing Notice of various breaches by Defendant and expressing willingness to consider a renegotiated contract within the current parameters of and while still honoring the existing Agreement.   Correspondence was exchanged up to the point of the Plaintiff offering to "clear the decks" and the Defendant agreeing to do so in order to proceed in good faith negotiations as set forth in the Plaintiff's October correspondence.

9.     Next, in November of 2012, the Plaintiff brought to Defendant AliMed's attention that the MAR payment obligation needed to be met and that upon receipt, further negotiations could ensue.

10.     Defendant AliMed, however, engaged in a series of communications the sole purpose of which was apparently to delay and avoid payment of the contractual amounts due to Plaintiff. One such communication on November 1, 2012 from Richard Clement, General Manager of Defendant Alimed stated that "AliMed desires a renegotiated exclusive license agreement" implying AliMed's belief in the continuity and validity of the Agreement.  Following that, the communications culminated in email correspondence from the Defendant AliMed which was in response to four alternate proposals of the Plaintiff in its good-faith efforts to negotiate a resolution.  Defendant AliMed categorically rejected all four without any proposed alternative. Further, the Defendant  AliMed stated that it "still has not finalized the decision" on what its intentions were, but that it was "simply not a feasible business move to pay any further minimum royalty payments."   All the while, Defendants have continued to actively market and sell Plaintiff's product.

11.     In response, counsel for the Plaintiff sought clarification and specifically addressed that Defendant Alimed confirmed that the Agreement was still in force and all obligations remained in place including, but not limited to the MAR payments which have not been forthcoming.

12.     Defendant AliMed acts as a master distributor of Plaintiff's protected products. Defendant White Star, through a separate agreement with AliMed, markets and sells Plaintiff's protected products. Due to the dispute between Plaintiff and AliMed, Defendant White Star does not currently have a licensing agreement to sell or distribute products covered by Plaintiff's patents, nor to advertise using Plaintiff's trademarks.

### IV.
### COUNT I: BREACH OF CONTRACT

13.     BedEx repeats and realleges the allegations set forth above as if fully set forth herein.

14.     Defendant Alimed's actions constitute a breach of contract. Section VII – Royalty and Payment, obligated Defendant, as Licensee, to remit a MAR, and a Running Royalty for each product sold.

15.     Defendant Alimed executed the Contract agreeing to make the scheduled MAR payments and has failed to do so. BedEx has been injured by Alimed's breach.

16.     As a result of Defendant Alimed's breach, Plaintiff seeks damages in an amount within the jurisdictional limits of the court.

### V.
### COUNT 2: TRADE SECRET VIOLATIONS

17.     BedEx repeats and realleges the allegations set forth above as if fully set forth herein.

18.     In the alternative and should it be determined that the Defendant has terminated the Agreement, then Defendant has been engaged in illegally marketing, distributing and selling Plaintiff's protected Property.  Specifically, Defendant has breached its fiduciary duty to the

Plaintiff; breached the Agreement; violated the Texas Theft Liability Act ("TTLA"); and violated 35 U.S. Code Section 271, "Infringement of Patent."

17.     The elements of a cause of action for misappropriation of trade secrets under the TTLA are as follows:

    (1) The plaintiff owned a trade secret.

    (2) The defendant used or disclosed the trade secret

        a.   In violation of a confidential or contractual relationship with the plaintiff;

        b.   After acquiring the trade secret by improper means; or

        c.   After acquiring the trade secret with notice that the disclosure was improper

    (3) The plaintiff suffered injury.

A trade secret is any formula, pattern, device, or compilation of information ("proprietary information") used in plaintiff's trade or business that gives the holder of the information a competitive advantage over those who do not know or use it and that is in fact a secret. *See In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). Customer information and lists, business methods, marketing information, pricing data, and technical information are among the types of proprietary information which qualify for protection. While a patent may not qualify for trade secret protection, any information that pertains to the patents that is not explicitly disclosed may still qualify for trade-secret protection. *See Luccous v. J.C. Kinley Co.,* 376 S.W.2d 336, 340 (Tex. 1964).

18.     Here, Plaintiff owned trade secrets, namely, proprietary information that pertains to the Patents manufactured, distributed, and sold by Defendants. Defendant AliMed has failed to make MAR payments under the terms of the Agreement; should the Court view AliMed's actions as a termination of the Agreement, then Defendants have terminated their right to Plaintiff's trade

secrets. As a result of AliMed's breach of the agreement, and subsequent misappropriation of Plaintiff's trade secrets, Plaintiff has suffered damages because Defendant has benefitted from the use of Plaintiff's proprietary information without compensating Plaintiff.

19.     A fiduciary relationship can arise from a relationship of trust and confidence. Here, Defendants created a fiduciary duty based on trust and confidence when it signed the Agreement, and became the exclusive manufacturer, and master distributor of Plaintiff's patented items. By failing to pay the MAR and continuing to manufacture, distribute, and sell Plaintiff's products, Defendants have breached their fiduciary duties of loyalty and utmost good faith, to refrain from self-dealing, fair and honest dealing, and full disclosure.

20.     In the alternative, if Defendant Alimed has terminated the Agreement, then both AliMed and White Star are in violation of 35 USC § 271 - Infringement of patent. Defendants make, use, offer to sell, and sell Plaintiff's patented inventions without a license.

21.     As a result of Defendants' violations Plaintiff seeks damages in an amount within the jurisdictional limits of the court.

## VI.
## COUNT THREE – UNJUST ENRICHMENT

22.     BedEx repeats and realleges the allegations set forth above as if fully set forth herein.

23.     By reason of the foregoing, all Defendants have unjustly enriched themselves, and continue to do so, in an unknown amount.

24.     BedEx is entitled to just compensation under the common law of the State of Texas.

## VII.
## REQUEST FOR PRELIMINARY INJUNCTION

25.      Plaintiff will likely suffer irreparable injury if defendants are not enjoined from marketing, advertising, selling or otherwise distributing BED-EX'S products subject to the

Patents, using disclosing, or copying any of Bed-Ex's confidential, financial, or proprietary information, and destroying manipulating, transferring, or otherwise disposing of and of Bed-Ex's confidential, financial, or proprietary information while this suit is pending. *See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008); Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012); Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).*

26.     There is no adequate remedy at law because the unauthorized marketing, advertising, selling and distributing of BED-EX's protected products and disclosure cannot be cured and damages are incalculable. *See N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984); Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 222 (1st Cir. 2003); Winston v. Gen. Drivers, Warehousemen & Helpers Local Union No. 89, 879 F. Supp. 719, 725 (W.D. Ky. 1995).*

27.     There is a substantial likelihood that plaintiff will prevail on the merits because the actions of AliMed are clear violations of the Agreement. *See Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32 (1975); Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10-11 (1st Cir. 2012); Bluefield Water Ass'n v. City of Starkville, 577 F.3d 250, 252-53 (5th Cir. 2009).*

28.     The harm faced by plaintiff outweighs the harm that would be sustained by defendant if the preliminary injunction were granted. The Agreement currently violated by AliMed is an exclusive right to manufacture, market, and sell BedEx products. AliMed is still free to derive revenue from products and agreements from other companies, where BedEx is not. *See Yakus v. United States, 321 U.S. 414, 440 (1944); Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 297 (5th Cir. 2012); Coca-Cola Co. v. Purdy, 382 F.3d 774, 789 (8th Cir. 2004).*

29.     Issuance of a preliminary injunction would not adversely affect the public interest. *See Opulent Life Church, 697 F.3d at 298; Alliance for the Wild Rockies, 632 F.3d at 1138-39; Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1362-63 (Fed. Cir. 2008).*

30.     Plaintiff is willing to post a bond in the amount the Court deems appropriate. *See Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 425-26 (3d Cir. 2010); Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 & n.3 (4th Cir. 1999).*

31.     Plaintiff asks the Court to set its application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, to issue a preliminary injunction against defendant.

## VII.
## REQUEST FOR PERMANENT INJUNCTION

32.     Plaintiff asks the Court to set its application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against defendant.

## VIII.
## APPLICATION FOR DECLARATORY JUDGMENT

33.     Defendant AliMed executed the Agreement and agreed to make MAR payments, and address any disputes arising from the Agreement within the jurisdiction of Texas either by way of arbitration or, in the case of the relief requested herein by way of injunction.  Defendants have now challenged its validity as "not a feasible business move".

34.     Therefore, the Plaintiff respectfully requests this Court to declare that the Agreement is valid.

35.    In addition, Plaintiff asks for reasonable and necessary attorney's fees pursuant to the TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 Declaratory Judgment Act.

## IX.
## NOTICE & CONDITIONS PRECEDENT

36.    All conditions precedent have been performed or have occurred as required by Federal Rule of Civil Procedure 9(c).

## X.
## ATTORNEY'S FEES

26.    As a result of Defendant's wrongful acts complained of herein, it was necessary for Plaintiff to hire the undersigned attorney. Pursuant to the Agreement and TEX. CIV. PRAC. & REM. CODE § 38.001 and § 37.009 Declaratory Judgment Act, Plaintiff seeks reasonable and necessary attorney's fees incurred by Plaintiff in pursuing this lawsuit

## XI.
## JURY DEMAND

27.    Plaintiff, BedEx asserts its right under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## PRAYER

28.    WHEREFORE, PREMISES CONSIDERED, Plaintiff, BED-EX Group, LLC respectfully prays that the Court issue citation for Defendant, ALIMED, INC., to appear and answer, that Plaintiff be awarded judgment against Defendants for actual and consequential damages, prejudgment and post judgment interest, court costs, attorney fees, declaratory relief, temporary restraining order, temporary injunction, permanent injunction,  and all other relief to which Plaintiff may be entitled, general or special, at law or in equity.

Respectfully Submitted,

PRINS LAW FIRM

By:   /s/ Todd A. Prins
      Todd. A. Prins
      State Bar No. 16330400
      4940 Broadway, Suite 108
      San Antonio, Texas 78209
      (210) 820-0833 [telephone]
      (210) 820-0929 [facsimile]
      *ATTORNEYS FOR PLAINTIFF*
      *BED-EX, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been delivered via CM/ECF electronic filing on this the 29th day of July 2013 to:

Les Katona, Jr,
CAVARETTA, KATONA & FRANCIS, PLLC
700 N. St. Mary's Street, Suite 1500
San Antonio, Texas 78205
(210)588-2901
(210)588-2908 (fax)

      /s/     Todd A. Prins

## AFFIDAVIT OF PAUL NEWHAM

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

Paul Newham appeared personally before me, the undersigned authority, and, upon oath, deposed and stated:

"My name is Paul Newham. I am over the age of twenty-one years, am fully competent to make this affidavit, have never been convicted of a felony or a crime of moral turpitude. I have personal knowledge of all of the facts set forth herein and they are true and correct.

I am the President of BED-EX INC. (hereinafter "BED-EX" or Plaintiff). In such capacity, I have familiarized myself with, and am a custodian of, the business records of BED-EX and do hereby attest and certify that the License Agreement ("Agreement") attached hereto as Exhibit "A" and incorporated herein by reference, is a true and correct copy of the original. These records were kept by BED-EX in the regular course of business, and it was the regular course of business of BED-EX for an employee or representative of BED-EX, with knowledge of the act, event, condition, opinion, or diagnosis that was recorded, to make this record or to transmit the information to be included in this record. The record was made at or near the time or reasonably soon after the act, event, condition, opinion, or diagnosis that was recorded. The records attached to this affidavit are the original or exact duplicates of the original.

BED-EX is the owner of the U.S. and Foreign Patents and Patent Applications identified in the Appendix A to the Agreement (the "PATENTS") for inventions generally and collectively described as "Modular Systems for Monitoring the Presence of a Person Using a Variety of Sensing Devices".

In exchange for valuable consideration, BED-EX and ALIMED, INC. (hereinafter "ALIMED" or "Defendant") entered into Agreement whereby Defendant would pay royalties, make such capital investments as it deems necessary, and carry out the manufacture, distribution and sale of certain products covered by the PATENTS. Further, Defendant agreed to pay Plaintiff a Minimum Annual Royalty ("MAR") according to the Schedule of Minimum Annual Royalties set forth in the APPENDIX D to the AGREEMENT.

Then, on September 5, 2012, Defendant issued an unsigned letter alleging breach on the part of the Plaintiff and that the Agreement would be terminated immediately if there was a breach and that the correspondence was to provide ninety days' Notice of termination should there be no breach.

Plaintiff responded on October 20, 2012 clarifying and explaining that there was no breach on the part of the Plaintiff; providing Notice of various breaches by Defendant and expressing willingness to consider a renegotiated contract within the current parameters of and while still honoring the existing Agreement.   Correspondence was exchanged up to the point of the Plaintiff offering to "clear the decks" and the Defendant agreeing to do so in order to proceed in good faith negotiations as set forth in the Plaintiff's October correspondence.

Next, in November of 2012, the Plaintiff brought to Defendant's attention that the MAR payment obligation needed to be met and that upon receipt, further negotiations could ensue.

Defendant, however, engaged in a series of communications which culminated in email correspondence from the Defendant which was in response to four alternate proposals of the Plaintiff in its good-faith efforts to negotiate a resolution.   The Defendant categorically rejected all four without any proposed alternative. Further, the Defendant stated that it "still has not finalized the decision" on what its intentions were, but that it was "simply not a feasible business move to pay any further minimum royalty payments."  All the while, the Defendant has continued to actively market and sell Plaintiff's product.

In response, counsel for the Plaintiff sought clarification and specifically addressed that the Defendant confirmed that the Agreement was still in force and all obligations remained in place including, but not limited to the MAR payments which have not been forthcoming.

The actions of the Defendant are clear violations of the Agreement's terms and conditions.

It is probable that Plaintiff will recover from Defendant after a trial on the merits because the actions of the Defendants are clear violations of the Agreement.

If Plaintiff's application is not granted, harm is imminent because Defendant is in the process of marketing, advertising, selling and distributing BED-EX's protected products and utilizing confidential and proprietary information.

The harm that will result if the temporary restraining order is not issued is irreparable because the Defendant's continued marketing, advertising, selling and distributing of BED-EX's protected products and utilization and dissemination of the confidential and proprietary information cannot be cured.

Plaintiff has no adequate remedy at law because such illicit marketing, advertising, selling and distributing of BED-EX's protected products and disclosure cannot be cured and damages are incalculable.



Paul Newham

Subscribed and sworn to before by Paul Newham me on this the 18th day of June, 2013.

P. TAMEZ
MY COMMISSION EXPIRES
September 26, 2016

Notary Public in and for the State of Texas



LICENSE AGREEMENT

This License Agreement ("AGREEMENT") is entered into between Bed-Ex, Inc. ("BED-EX"), a Delaware Corporation, hereinafter referred to as LICENSOR, having its principal place of business at San Antonio, Texas, and AliMed, Inc. ("ALIMED"), a Corporation of the State of Massachusetts, having its principal place of business at Dedham, Massachusetts, hereinafter referred to as LICENSEE, as of the date of execution of the last PARTY hereto.

WHEREAS, LICENSOR is the owner of the U.S. and Foreign Patents and Patent Applications identified in APPENDIX A hereto (the "PATENTS") for inventions generally and collectively described as "Modular Systems for Monitoring the Presence of a Person Using a Variety of Sensing Devices"; and,

WHEREAS, LICENSEE, in consideration of the grant of a license under the PATENTS, will pay royalties, make such capital investments as it deems necessary, and carry out the manufacture, distribution and sale of certain products covered by the PATENTS; and,

WHEREAS, LICENSOR has determined that the granting of a license to LICENSEE under the PATENTS will provide the necessary incentive for LICENSEE to achieve the desired exploitation of the invention and the granting of such license to LICENSEE will therefore be mutually beneficial to the PARTIES;

NOW, THEREFORE, in consideration of the foregoing and of the terms hereinafter contained in this AGREEMENT, the LICENSOR and LICENSEE agree as set forth below:

ARTICLE I - Definitions

"ACCOUNTING PERIOD" shall mean the period for which royalties are calculated. For this AGREEMENT, the period is every three (3) months.

"BREACH" shall mean (a) a violation or nonperformance by a PARTY of a MATERIAL term, condition, covenant or warranty herein, or (b) a misrepresentation made hereunder or (c) a misrepresentation by LICENSEE to induce LICENSOR to enter into this AGREEMENT (also see "MATERIAL").

"BREACHING PARTY" shall mean the PARTY in BREACH, as used in Section 17.2.

"GROSS SALES" shall mean either the total number of products invoiced for by LICENSEE, for all disposals i.e., (sales, including uses by LICENSEE, leases, transfers, etc.) of ROYALTY-BASE PRODUCTS for consideration determined in, or as if in, an arm's length transaction.

"INSOLVENT" shall mean that LICENSEE has either ceased to pay its debts (which may include failure to pay royalty payments under this AGREEMENT) in the ordinary course of business or cannot pay its debts as they fall due or is insolvent within the meaning of the Federal Bankruptcy Code (11 U.S.C. § 101 (31)).

"LICENSE COMMENCEMENT DATE" shall mean the date that the last PARTY has executed this AGREEMENT.

"LICENSE EXPIRATION DATE" shall mean the last day that this AGREEMENT is in effect.

EXHIBIT A

"LICENSE TERM" shall mean the period of time starting with the LICENSE COMMENCEMENT DATE and ending with the LICENSE EXPIRATION DATE.

"LICENSED AREA" shall mean the United States and Canada.

"LICENSED FIELD OR EMBODIMENT(S)" shall mean the medical and health care fields.

"LICENSED INVENTION" shall mean the invention defined by the LICENSED PATENTS and as may be further limited by ARTICLE II.

"LICENSED PATENTS" shall mean the patents and patent applications identified in APPENDIX A hereto and shall include any corresponding: reissue patents; modifications of said LICENSED PATENTS by means of certificates of correction or reexamination certificates; and continuation or divisional patent applications and patents (specifically excluding patent applications and patents containing new matter) derived from said LICENSED PATENTS.

"MATERIAL," with respect to a particular matter (e.g., a BREACH), shall mean that the matter is shown to affect adversely (a) the rights and benefits of the other PARTY under this AGREEMENT; or (b) the ability of the other PARTY to perform its obligations hereunder; and, in either case, to such a degree that a reasonable person in the management of his or her own affairs would be more likely than not to decline to enter into this AGREEMENT in view of the matter in question.

"NET SALES" shall mean GROSS SALES, less allowances for returns, freight and insurance. In the case of a sale or other disposition of ROYALTY-BASE PRODUCTS which are transferred to a purchaser who does not deal at arm's length, or transferred or otherwise disposed of for other than monetary consideration (including allocations to LICENSEE's own beneficial use), NET SALES shall be calculated in accordance with Section 7.6 of this AGREEMENT.

"NONBREACHING PARTY" shall mean the PARTY not in BREACH, as used in Section 17.2.

"PARTY" shall mean a party to this AGREEMENT.

"PERSON" shall mean a natural person; a corporation (for profit or not-for-profit); an association; a partnership (general or limited); a joint venture; a trust; a government or political department, subdivision, or agency; a municipality; or any other entity.

"ROYALTY-BASE PRODUCTS" shall include the components of an item sold, used, leased, transferred, or otherwise disposed of by LICENSEE or its SUBLICENSEEs that is covered by or included within the LICENSED INVENTION. For purposes of this license, ROYALTY-BASE PRODUCTS include, without limitation, the products identified as such on APPENDIX B hereto. Where negotiated with the LICENSEE, ROYALTY-BASE PRODUCTS may include other components of the item not covered by or within the LICENSED INVENTION that LICENSEE or its SUBLICENSEEs would not have sold, used, leased, transferred, or otherwise disposed of but for the sale, use, lease, transfer, or other disposition of the LICENSED INVENTION.

"SUBLICENSEE" shall mean any PERSON who has the right, granted by LICENSEE, to make, use, or sell the LICENSED INVENTION.

"THIRD PARTIES" shall mean PERSONS other than the LICENSOR and the LICENSEE.

## ARTICLE II - License Grant

2.1 LICENSOR hereby grants to LICENSEE a terminable, royalty-bearing, exclusive license to practice, i.e., to make, have made, use, offer to sell, sell, transfer, or dispose of, the LICENSED INVENTION as limited to the LICENSED AREA and as may be limited to a LICENSED FIELD OR EMBODIMENT(S), as defined in ARTICLE I.

2.2 LICENSOR hereby grants to LICENSEE a terminable, royalty-bearing, non-exclusive license to practice, i.e., to make, have made, use, offer to sell, sell, transfer, or dispose of, the LICENSED INVENTION throughout the world outside of the LICENSED AREA, as may be limited to a LICENSED FIELD OR EMBODIMENT(S), as defined in ARTICLE I. 2.3 Notwithstanding anything to the contrary in this AGREEMENT, LICENSEE shall take the licenses granted in this ARTICLE II subject to any outstanding licenses or other rights in THIRD PARTIES under agreements executed by LICENSOR prior to the LICENSE COMMENCEMENT DATE, which outstanding licenses or other rights shall be phased out and terminated by the LICENSOR during the first year of the LICENSE TERM. The distributors holding such outstanding licenses or other rights are listed along with the market areas they serve on APPENDIX E attached hereto.

2.4 LICENSOR reserves an irrevocable, royalty-free right to practice and have practiced the LICENSED INVENTION throughout the world outside of the LICENSED AREA by or on behalf of itself.

2.4 The exclusivity provision of the license granted in 2.1 above shall itself be terminable separate and apart from the balance of the provisions in this AGREEMENT according to the terms set forth herein below in ARTICLE XX.

## ARTICLE III - Sublicenses

3.1 Upon written approval by LICENSOR, LICENSEE may grant a written royalty-bearing, sublicense under the license granted in ARTICLE II provided that it submits to LICENSOR a written request, in advance, for permission to grant the sublicense, including with said request a copy of the proposed sublicense. The proposed sublicense shall refer to and be generally consistent with this AGREEMENT and shall include the rights reserved by LICENSOR under Section 2.3. The proposed sublicense shall include the condition that the sublicense shall automatically terminate upon the revocation or termination of this AGREEMENT. Licensor's approval shall not be unreasonably delayed or withheld.

3.2 LICENSEE shall furnish LICENSOR with a copy of the sublicense, consistent with the proposed sublicense approved by LICENSOR and executed by both LICENSEE and its SUBLICENSEE, within fifteen (15) days after the grant of the sublicense by LICENSEE.

3.3 LICENSEE shall submit to LICENSOR, for advance approval, any proposed modification of a sublicense. LICENSEE shall also submit to LICENSOR a copy of the sublicense modification (either as an addendum or a new sublicense), consistent with the proposed sublicense modification and executed by both LICENSEE and its SUBLICENSEE, within fifteen (15) days after the effective date of the sublicense modification.

3.4 The granting of a sublicense by LICENSEE shall not operate to relieve LICENSEE from any of its obligations under this AGREEMENT.

3.5 LICENSEE shall be responsible for and remit royalties based upon its SUBLICENSEE's activities as if said activities were its own as much as possible under ordinary business practices.

Page 3 of 15

EXHIBIT A

ARTICLE IV - Term of License

4.1 The license granted in ARTICLE II will be in effect for a LICENSE TERM that is initially equal to the shorter of five (5) years or the unexpired term of the last patent to be in effect of the patent(s) encompassed under the definition of LICENSED PATENTS.

4.2 The license granted in ARTICLE II will automatically renew for additional LICENSE TERMS that are equal to the shorter of two (2) years or the unexpired term of the last patent to be in effect of the patent(s) encompassed under the definition of LICENSED PATENTS terms, unless either Party gives Notice to the other of termination of the AGREEMENT at least six (6) months in advance of the end of the then current LICENSE TERM. In the event or a termination of this AGREEMENT, the LICENSEE and any SUBLICENSEE may continue to sell all Products including Royalty-Base products then in its inventory or on purchase order at the time of termination.

ARTICLE V - Practical Distribution

5.1 LICENSEE shall use best efforts to initiate PRACTICAL DISTRIBUTION of the LICENSED INVENTION within three (3) months of the LICENSE COMMENCEMENT DATE and in accordance with the schedule set forth in the APPENDIX C to this AGREEMENT and incorporated into this AGREEMENT.

5.2 LICENSEE, once PRACTICAL DISTRIBUTION of the LICENSED INVENTION is initiated, shall thereafter maintain such distribution throughout the LICENSE TERM.

ARTICLE VI – Quality Standards

6.1 In achieving PRACTICAL DISTRIBUTION of the LICENSED INVENTION, LICENSEE agrees that any products embodying the LICENSED INVENTION or produced through the use of the LICENSED INVENTION shall be manufactured substantially in accordance with the QUALITY STANDARDS established by the LICENSOR in its historical manufacturing of the LICENSED INVENTION.

6.2 To fulfill the obligations of Section 6.1 above, LICENSEE agrees to provide the LICENSOR information identifying any outsourced manufacturers as well as copies of all materials provided to such out-sourced manufacturers for the purpose of guiding the manufacture of products under the LICENSED INVENTION and controlling the quality thereof.

6.3 LICENSEE shall further provide LICENSOR with access to any outsourced manufacturers for the purpose of; (a) having products manufactured pursuant to Section 2.3 above, and/or (b) securing the PRACTICAL DISTRIBUTION of the LICENSED INVENTION only upon the failure of LICENSEE to achieve the same according to the terms of this AGREEMENT. LICENSOR agrees that the identity of the outsourced manufacturers and the materials provided to them shall be treated as confidential information of LICENSEE and shall not be disseminated to any third parties.

ARTICLE VII - Royalty and Payment

7.1 In consideration of the license granted in ARTICLE II, LICENSEE shall remit to LICENSOR a License Fee in the amount of the first *pro rata* portion $16,250.00) of the Minimum Annual Royalty due for the first year as defined in Section 7.3 below, upon the execution of this AGREEMENT by LICENSEE. The License Fee shall be creditable against the Running Royalty set forth below for the first year of the initial LICENSE TERM.

Page 4 of 15

7.2 LICENSEE agrees to pay LICENSOR a Running Royalty of three dollars (US$3.00) per unit product according to NET SALES of ROYALTY-BASE PRODUCTS sold during the LICENSE TERM.

7.3 LICENSEE agrees to pay LICENSOR a Minimum Annual Royalty according to the Schedule of Minimum Annual Royalties set forth in the APPENDIX D to this AGREEMENT and incorporated into this Agreement.

7.4 The Running Royalty set forth in Section 7.2 above shall be remitted to LICENSOR within 30 days of the end of every ACCOUNTING PERIOD, i.e., within 30 days after the first day of each January, April, July, and October.

7.5 If the Running Royalty due for any ACCOUNTING PERIOD, plus any Running Royalty carried forward, is less than a *pro rata* portion of the Minimum Annual Royalty for that year (i.e. 25% of the Minimum Annual Royalty) then the difference shall be remitted to LICENSOR in conjunction with the payment of the Running Royalty according to Section 7.4. Any Running Royalty due (and paid) for any ACCOUNTING PERIOD in excess of the *pro rata* portion of the Minimum Annual Royalty for that year shall carry forward to the next ACCOUNTING PERIOD *unless the next ACCOUNTING PERIOD* comprises the first ACCOUNTING PERIOD for the next year of the term of the AGREEMENT

7.6 LICENSEE agrees that in the event any ROYALTY-BASE PRODUCTS shall be sold, transferred, or disposed of, to a third-party for purposes of resale in a transaction that does not represent an arm's length transaction, then the royalties to be paid under this AGREEMENT for the ROYALTY-BASE PRODUCTS shall be based upon the NET SALES of the ROYALTY-BASE PRODUCTS by the third-party, rather than upon the NET SALES of the LICENSEE. Examples of transactions that do not reflect an arm's length transaction includes sales, transfers or disposals (1) to any type of organization or individual who owns a controlling interest in LICENSEE by stock ownership or otherwise, (2) to any type of organization in which LICENSEE shall own, directly or indirectly, a controlling interest by stock ownership or otherwise, or (3) to any type of organization with which, or individual with whom, LICENSEE, its stockholders, or associated companies shall have any agreement, understanding, or arrangement (such as, among other things, an option to purchase stock, an arrangement involving a division of profits, or special rebates or allowances) without which agreement, understanding, or arrangement, prices paid by such organization or individual for the ROYALTY-BASE PRODUCTS would be higher than the prices paid for the NET SALES reported by LICENSEE, or if such agreement, understanding, or arrangement results in extending to such organization or individual lower prices for ROYALTY-BASE PRODUCTS than those charged to outside concerns buying similar merchandise in similar amounts and under similar conditions.

7.7 Under this AGREEMENT, ROYALTY-BASE PRODUCTS will be considered sold when invoiced, except that upon expiration of the LICENSED PATENT, or upon termination of the license, all shipments made on or prior to the day of such expiration or termination which have not been invoiced prior thereto shall be royalty-bearing.

7.8 Royalties shall be paid within thirty (30) days of the end of each ACCOUNTING PERIOD. Royalties shall be paid by check, denominated in United States dollars, and made payable to Bed-Ex, Inc. The check shall be mailed to LICENSOR at the address set forth in ARTICLE XV of this AGREEMENT concurrently with the report required in ARTICLE VIII of this AGREEMENT. LICENSOR's acceptance of any royalty payment does not eliminate LICENSOR's right to contest the accuracy of such payment in the future.

ARTICLE VIII - Reports

8.1 LICENSEE shall submit to LICENSOR written reports within thirty (30) days of the end of every ACCOUNTING PERIOD whether or not royalties are due. Each report shall be submitted concurrently with the royalties required by ARTICLE VII. To ensure that any proprietary information submitted by LICENSEE is protected to the fullest extent of the law, LICENSEE should mark with a proprietary notice, any portions of the report that is considered proprietary to LICENSEE.

8.2 Each report shall include the following information:

(a) A narrative description of the ROYALTY-BASE PRODUCTS currently being offered for sale by LICENSEE and its SUBLICENSEEs. Copies of current sales brochures, promotional materials, and price lists shall be included with this description.

(b) A list of the geographic locations at which the LICENSED INVENTION is being manufactured.

(c) The number and type of ROYALTY-BASE PRODUCTS sold or disposed of by LICENSEE.

(d) The number and type of ROYALTY-BASE PRODUCTS sold or disposed of by each SUBLICENSEE (if any).

(e) The number and type of ROYALTY-BASE PRODUCTS sold or disposed of by each reseller of ROYALTY-BASE PRODUCTS under Section 7.6.

(f) LICENSEE's GROSS SALES.

(g) GROSS SALES for each SUBLICENSEE (if any).

(h) GROSS SALES for each reseller of ROYALTY-BASE PRODUCTS under Section 7.6.

(i) LICENSEE's NET SALES.

(j) NET SALES for each SUBLICENSEE (if any).

(k) NET SALES for each reseller of ROYALTY BASED PRODUCTS under Section 7.6.

(l) The amount of royalties due LICENSOR.

8.3 Each report shall be accompanied by a certification by an officer of LICENSEE that the LICENSEE is complying with the terms and conditions of this AGREEMENT and that the responses to each part of Section 8.2 are accurate and complete.

8.4 LICENSEE shall, on an annual basis, submit to LICENSOR an audited balance sheet and an audited income statement. Internal audits are permissible, but LICENSOR reserves the right to require an independent audit and additionally reserves the right to approve of the auditor. AT LICENSORS EXPENSE.

8.5 A final report shall be submitted to LICENSOR by LICENSEE within thirty (30) days after the termination of this AGREEMENT.

Page 6 of 15

EXHIBIT A

## ARTICLE IX - Audit Rights

9.1 LICENSEE shall keep full, true, and accurate records for the purpose of LICENSOR verifying LICENSEE's reports to LICENSOR under ARTICLE VIII, verifying LICENSEE's royalty payments to LICENSOR under ARTICLE VII, and for determining LICENSEE's activities in general under the AGREEMENT. These records shall include, but are not limited to, ledgers and journals of account, customer orders, invoices, shipping documents, inventory records, computer records, purchase orders, and tax records. These records, as a whole, shall include information which will allow, at a minimum, identification of suppliers, customers, items sold or otherwise transferred, and/or services rendered, as well as whether the LICENSEE is operating within the scope of its license.

9.2 The records described in Section 9.1 shall be available for audit by LICENSOR, or by an authorized representative of LICENSOR, once per year during the LICENSE TERM, upon reasonable advance notice and during Licensee's normal business hours and once per year for three (3) calendar years thereafter. In addition, LICENSEE shall permit inspection by LICENSOR, or by an authorized representative of LICENSOR, of LICENSEE's assembly facilities and of LICENSEE's inventory of ROYALTY-BASE PRODUCTS, including parts, works-in-progress, and finished goods, during any audit by LICENSOR.

## ARTICLE X - Marking

10.1 LICENSEE and all SUBLICENSEEs shall mark all ROYALTY-BASE PRODUCTS, or products incorporating ROYALTY-BASE PRODUCTS, in accordance with the statutes of the United States relating to the marking of patented articles (see 35 U.S.C. § 287). Such marking shall be accomplished by fixing on the article or when, from the character of the article, this cannot be done, by fixing to it, or to the package wherein one or more of the articles is contained, a label including the notation "Manufactured and Sold under License from Bed-Ex, Inc." Such marking shall also be included into all literature and/or advertising materials describing the LICENSED INVENTION.

## ARTICLE XI - Use of the BED-EX Name

11.1 Except as required by Section 10.1, LICENSEE may use the name of LICENSOR, or the short form "BED-EX," only in truthful statements concerning its relationship with LICENSOR.

11.2 Uses of the trade name "BED-EX", other than as required by Section 10.1 or specified in Section 11.1, shall require the express written approval of LICENSOR. Approval by LICENSOR shall not be unreasonably withheld.

11.3 LICENSEE agrees to make copies of its marketing literature available to LICENSOR so that LICENSOR can determine that such use is in accordance with the terms of this ARTICLE.

## ARTICLE XII - Insurance

12.1 The PARTIES agree to each acquire and maintain a liability insurance policy having minimum limits of $2,000,000 aggregate and $1,000,000 per occurrence and to name the other PARTY as a beneficiary under such policy. Upon request, each PARTY will provide evidence of the acquisition and maintenance of such insurance to the other PARTY.



EXHIBIT A

## ARTICLE XIII - Risk Allocation

13.1 It shall be the responsibility of the LICENSEE to ensure that any and all embodiments of the LICENSED INVENTION are safe under all reasonably expected circumstances and fall within the scope of at least one of the claims in the LICENSED PATENTS.

13.2 Independent of, severable from, and to be enforced independently of any other enforceable or unenforceable provision of this AGREEMENT, other than for infringement of one PARTY's intellectual property rights by another PARTY, (including any engagement in licensable activities by licenses beyond the scope of the license provided by this AGREEMENT), neither PARTY will be liable to the other PARTY (nor to any THIRD PARTY claiming rights derived from the other PARTY's rights) for incidental, consequential, special, punitive, or exemplary damages of any kind, including lost profits, loss of business, or other economic damage, and further including injury to property, as a result of breach of any warranty or other term of this AGREEMENT, regardless of whether the PARTY liable or allegedly liable was advised, had reason to know, or in fact knew of the possibility thereof.

## ARTICLE XIV - Patent Validity

14.1 If, in any proceeding in which the validity, infringement, or priority of invention of any claim of the LICENSED PATENT to LICENSEE is in issue, a judgment or decree is entered which becomes final (below referred to as an "final judgment"), the construction placed upon any such claim by such final judgment shall thereafter be followed, not only as to such claim but as to all claims to which such construction applies, with respect to subsequently occurring acts. If such final judgment holds any claim invalid, LICENSEE shall be relieved prospectively (1) from including in its reports ROYALTY-BASE PRODUCTS sold or otherwise disposed of covered only by such claim or any broader claim to which such final judgment is applicable, and (2) from the performance of those other acts which may be required by this AGREEMENT only because of any such claim. However, if there are two or more conflicting final judgments with respect to the same claim based on the same grounds or where the same issues were raised, the decision of the higher tribunal shall be followed, but if the tribunals be of equal dignity, then the decision more favorable to the claim shall be followed.

14.2 In the event evidentiary material comes to the attention of the LICENSEE subsequent to the LICENSEE's execution of this AGREEMENT which, in the judgment of the LICENSEE, bears on the validity or scope of any LICENSED PATENT, the LICENSOR will in good faith discuss with the LICENSEE whether such evidentiary material so affects the validity or scope of the LICENSED PATENT to which it is asserted to apply that the terms of the license in respect to such LICENSED PATENT should be modified.

14.3 If the LICENSEE, subsequent to the date of its execution of this AGREEMENT, asserts the invalidity of any claim in any LICENSED PATENT, if coupled with or followed by: (a) the withholding, or notice of intention to withhold, or denial of obligation to pay, royalties otherwise payable under this AGREEMENT in respect to the LICENSEE's operations under such claim; or (b) the initiation or participation in a suit challenging or denying the validity of such claim in reference to LICENSEE's operations under this AGREEMENT, such action may, at the option of the LICENSOR, be conclusively presumed to constitute LICENSEE's termination, as of the earliest provable date of such withholding, notice, denial, initiation, or participation, of its AGREEMENT including its obligation for payment of royalties due from the date of the termination.



## ARTICLE XV- Points of Contact

15.1 The following individuals are designated as the points of contact for their respective PARTY. These points of contact are the principal representatives of the PARTIES involved in the performance of this AGREEMENT.

| LICENSOR | LICENSEE |
|---|---|
| Bed-Ex, Inc. | AliMed, Inc. |

Name: Paul Newham                     Name: Richard Clement

Title: President                         Title: Vice President

Address: 707 Cypresstree            Address: 279 High Street
       San Antonio, TX 78245           Dedham, MA 02206

Telephone No.: 210-680-6986         Telephone No.: 781-329-2900

Facsimile No.: _____            Facsimile No.: _____

Email: newhampaul@satx.rr.com      Email: rclement@AliMed.com
With a copy to:                           With a copy to:

Mark A. Kammer, Esq.                 Lawrence M. Slater, Esq.
7700 Broadway, Suite 202            270 Union Street, Ste. 202
San Antonio, TX 78209               Lynn, MA 01901
Tel No.: 210-832-0900                 Tel No. 781-592-0216
Facsimile No.: 210-832-0901          Facsimile No. 781-592-0217
Email: makammer@kammerbrowning.com    Email lslater@lmslater.com

## ARTICLE XVI - Notices

16.1 Notices hereunder will be delivered and effective as follows:

(a) Every notice required or contemplated by this AGREEMENT to be given either PARTY may be delivered in person or may be sent by courier, telecopy, express mail, read confirmed email, or postage prepaid certified or registered air mail (or its equivalent under the laws of the country where mailed), addressed to the PARTY for whom it is intended, at the address specified in ARTICLE XV. Either PARTY may change its address for notice by giving notice to the other PARTY of the change.

(b) Any written notice will be effective no earlier than the date actually received.

(c) Unless otherwise provided in this AGREEMENT, notice by courier, or by express, certified, or registered mail, will be effective on the date it is officially recorded as delivered by return receipt or the equivalent, and in the absence of such record as to delivery, it will be rebuttably presumed to have been delivered on the fifth business day after it was deposited, first-class postage prepaid, in the mails.



EXHIBIT A

(d) Notice by read confirmed email will be deemed given at the time a read confirmation email return is recorded received by the email server of the original sender of the Notice in the ordinary course of business showing the Notice email as having been delivered.

(e) Notice not given in writing will be effective only if acknowledged in writing by a duly authorized officer of the PARTY to whom it was given.

(f) As used in this ARTICLE, a reference to a particular date means the date itself, if a business day, otherwise the first business day after the date.

### ARTICLE XVII - Infringement

17.1 If LICENSEE becomes aware of an infringement or has reasonable cause to believe that there has been an infringement of any LICENSED PATENT, LICENSEE shall notify LICENSOR in writing concerning LICENSEE's knowledge of any infringement or of the reasonable cause for belief of infringement. Such notice should include: an analysis of how the claims of any LICENSED PATENT read-on the allegedly infringing articles; the identity of the alleged infringers; a statement as to whether the alleged infringers are making, using, or selling the allegedly infringing articles; a statement describing the extent of the alleged infringement; and a statement which describes and quantifies the harm being suffered by the LICENSEE as a result of the alleged infringement. If such notice and information are furnished, LICENSOR may volunteer its opinion as to whether reasonable cause exists to believe that there has been an infringement. LICENSEE is authorized (a) to bring suit in its own name, at its own expense, and on its own behalf, for infringement of the LICENSED PATENT, and (b) in any such suit, to enjoin infringement and to collect for its use, damages, profits and awards of whatever nature, recoverable from such infringement, subject to payment of royalties due to BED-EX, and further, (c) to settle any claim or suit for infringement of the LICENSED PATENT, as by granting a sublicense under this AGREEMENT. With respect to the royalties due to BED-EX from LICENSEE's successful infringement action, the parties agree to enter into good faith negotiations to arrive at the appropriate amount of royalties due to BED-EX. The authority to bring suit is subject to the continuing right of the LICENSOR to bring suit itself or to intervene in LICENSEE's suit; and, in either event, LICENSEE shall give LICENSOR reasonable notice and assistance.   Although LICENSEE is authorized to bring suit, as aforesaid, it is not required to do so under this AGREEMENT.

### ARTICLE XVIII - Dispute or Breach

18.1 All disputes concerning the interpretation or application of this AGREEMENT shall be discussed mutually between the PARTIES. Any disputes which are not disposed of by mutual agreement shall be decided by an independent arbiter, mediator, or designee, who shall reduce the decision to writing and mail or otherwise furnish a copy thereof to the PARTIES. The PARTIES may respond to such notice of a decision in accordance with the procedures set forth in Section 19.8.

18.2 In the event of a BREACH of any provision of this AGREEMENT, the NONBREACHING PARTY shall give the BREACHING PARTY notice describing the BREACH and stating that the BREACHING PARTY has thirty (30) days after notice of the BREACH to cure the BREACH or show cause why the AGREEMENT should not be terminated in accordance with Section 19.8.

18.3 If a provision of this AGREEMENT sets forth a cure period for the BREACH in question other than thirty (30) days, then that provision shall take precedence over the cure period set forth in Section 18.2.

18.4 No cure period is required, except as may be otherwise provided in this AGREEMENT, if: (a) this AGREEMENT sets forth specific deadline dates for the obligation allegedly breached; or (b) this





AGREEMENT otherwise states that no cure period is required in connection with the termination in question.

18.5 The BREACHING PARTY will be deemed to have cured such BREACH if within the cure period it takes steps reasonably adequate to alleviate any damage to the NONBREACHING PARTY resulting from the BREACH and to prevent a similar future BREACH.

### ARTICLE XIX - Termination or Modification

19.1 The PARTIES may terminate or modify this AGREEMENT by mutual consent upon such terms as they may agree in writing.

19.2 Either PARTY may terminate this AGREEMENT by failing to extend the LICENSE TERM, if an extension is provided for in Section 4.1.

19.3 Either PARTY may terminate this AGREEMENT upon the discovery by one PARTY of any intentional MATERIAL false statement or misrepresentation made or submitted by the other PARTY which BREACHES any obligation under the terms of this AGREEMENT or upon the discovery by one PARTY that the other PARTY has committed a MATERIAL breach of a provision of the AGREEMENT.

19.4 LICENSEE may prospectively terminate this AGREEMENT upon ninety (90) days written notice to LICENSOR.

19.5 This AGREEMENT may be terminated by LICENSOR if:

(a) LICENSOR determines that LICENSEE has failed or will fail to achieve or maintain PRACTICAL DISTRIBUTION of the LICENSED INVENTION as provided by ARTICLE V.

(b) LICENSOR determines that LICENSEE has failed or will fail to meet the QUALITY STANDARDS of the LICENSOR provided by ARTICLE VI.

(c) LICENSOR determines that LICENSEE has failed or will fail to meet market demand for the LICENSED INVENTION.

(d) LICENSEE fails to pay royalties and submit reports as provided by ARTICLES VII and VIII, except as termination of the exclusivity provision is provided for by ARTICLE XX below.

19.6 LICENSOR may terminate this AGREEMENT if LICENSEE becomes "INSOLVENT." LICENSEE must notify LICENSOR within thirty (30) days after becoming INSOLVENT. LICENSEE's failure to conform to this requirement shall be deemed a material, incurable breach.

19.7 LICENSEE must promptly inform LICENSOR of its intention to file a voluntary petition in bankruptcy or of another's communicated intention to file an involuntary petition in bankruptcy. LICENSOR may terminate this AGREEMENT upon receiving notice of intention to file. LICENSEE's filing without conforming to this requirement shall be deemed a material, pre-petition incurable breach.

19.8 Before LICENSOR unilaterally modifies, or terminates this AGREEMENT for any cause, LICENSOR will furnish LICENSEE and all SUBLICENSEES of record a written notice stating



LICENSOR's intention to modify or terminate the AGREEMENT and the reasons therefore. LICENSEE and SUBLICENSEES of record will be allowed  sixty (60) days after: (1) such notice to remedy any BREACH of the AGREEMENT or show cause why the AGREEMENT should not be unilaterally modified or terminated; or, (2) such notice of a decision regarding a dispute, rendered in accordance with Article 18.1, to rebut such decision.

19.9 Nothing in this ARTICLE shall be interpreted as precluding actions at law. .

19.10 All royalties and reports due up to and including the date of termination of this AGREEMENT are due within thirty (30) days of the date of termination.

## ARTICLE XX – Termination of Exclusivity

20.1 The exclusivity provision of the license grant given in Section 2.1 shall itself be separately terminable if:

(a) LICENSEE gives notice to LICENSOR ninety (90) days in advance of its intent to relinquish the exclusivity provision of the license grant; or

(b) LICENSEE fails to pay any Minimum Annual Royalty due as provided by ARTICLE VII, given thirty (30) days to cure after notice' from LICENSOR of the delinquent Minimum Annual Royalty payment (or more specifically the quarterly pro rata portion thereof).

20.2 Termination of the exclusivity provision of the license grant according to the terms of this ARTICLE XX shall not affect any other terms of this AGREEMENT except as to terminate the requirements for payment of further Minimum Annual Royalties by the LICENSEE and to thereafter permit the LICENSOR to enter into other non-exclusive licensing arrangements with THIRD PARTIES without the need for consultation with or the consent of the LICENSEE.

20.3 Termination of the exclusivity provision of the license grant shall not affect any Minimum Annual Royalty payments (or more specifically the quarterly pro rata portion thereof) already paid by the LICENSEE to the LICENSOR.

## ARTICLE XXI - Assignment

21.1 Upon written approval by LICENSOR, LICENSEE may assign this AGREEMENT provided that LICENSEE submits to LICENSOR, in advance, a written request for permission to grant the assignment, information that BED-EX considers necessary to evaluate the proposed assignment, and a copy of the proposed assignment. If LICENSOR approves the assignment as being consistent with BED-EX's interests, the PARTIES and the assignee will be required to execute a novation agreement. At a minimum, the novation agreement will provide that LICENSEE waives all rights under the license, the assignee assumes all obligations under the AGREEMENT and that LICENSOR recognizes the assignee as the successor in interest to the AGREEMENT. Notwithstanding the forgoing, either PARTY may freely assign its rights hereunder in the event that  the PARTY either sells or transfers substantially all of its assets or shares or enters into a merger or consolidation.

EXHIBIT A

### ARTICLE XXII - Governing Law

22.1 This AGREEMENT will be interpreted and enforced in accordance with United States federal law and the laws of the Commonwealth of Massachusetts. Disputes arising hereunder shall be resolved by binding arbitration before the American Arbitration Association pursuant to the AAA rules governing commercial disputes. Venue for dispute resolution shall be Boston MA in the event LICENSOR raises the dispute, and shall be San Antonio TX in the event LICENSEE raises the dispute.

### ARTICLE XXIII - Independent Entities

23.1 The Parties are separate and independent entities. Except as may be expressly and unambiguously provided in this AGREEMENT, no partnership or joint venture is intended to be created by this AGREEMENT, nor any principal-agent or employer-employee relationship.

23.2 Except to the extent expressly provided in this AGREEMENT, neither PARTY has, nor shall attempt to assert, the authority to make commitments for or to bind the other PARTY to any obligation.

### ARTICLE XXIV - Effect of Partial Invalidity

24.1 If any one of more of the provisions of this AGREEMENT should be ruled wholly or partly invalid or unenforceable by a court or other government body of competent jurisdiction, and as long as the fundamental objectives of the AGREEMENT can be carried out, then: (a) the validity and enforceability of all provisions of this AGREEMENT not ruled to be invalid or unenforceable will be unaffected; (b) the provision(s) held wholly or partly invalid or unenforceable will be deemed to be amended, and the court or other government body is authorized to reform the provision(s), to the minimum extent necessary to render them valid and enforceable in conformity with the PARTIES' intent as manifested herein; and (c) if the ruling, and/or the controlling principle of law or equity leading to the ruling, is subsequently overruled, modified, or amended by legislative, judicial, or administrative action, then the provision(s) in question, as originally set forth in this AGREEMENT, will be deemed to be valid and enforceable to the maximum extent permitted by the new controlling principle of law or equity.

### ARTICLE XXV – Non-waiver

25.1 The failure of either PARTY at any time to require performance by the other PARTY of any provisions of this AGREEMENT shall in no way affect the right of such PARTY to require future performance of that provision. Any waiver by either PARTY of any BREACH of any provision of this AGREEMENT shall not be construed as a waiver of any continuing or succeeding BREACH of such provision, a waiver of the provision itself, or a waiver of any right under this AGREEMENT.

### ARTICLE XXVI - Entire Agreement

26.1 Except as may be expressly provided otherwise herein, this AGREEMENT constitutes the entire agreement between the PARTIES concerning the subject matter thereof. No prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the PARTIES with reference thereto will be of any force or effect. This AGREEMENT may only be modified by written agreement of the PARTIES.

### ARTICLE XXVII - Article Headings

27.1 The ARTICLE headings contained in this AGREEMENT are for reference purposes only and shall not in any way control the meaning or interpretation of this AGREEMENT.

EXHIBIT A

### ARTICLE XXVIII - Counterparts

28.1 This AGREEMENT may be executed in separate counterparts, each of which so executed and delivered shall constitute an original, but all such counterparts shall together constitute one and the same instrument. Any such counterpart may comprise one or more duplicates or duplicate signature pages, any of which may be executed by less than all of the PARTIES, provided that each PARTY executes at least one such duplicate or duplicate signature page. The PARTIES stipulate that a photocopy of an executed original will be admissible in evidence for all purposes in any proceeding as between the PARTIES.

### ARTICLE XXIX - Acceptance

29.1 In witness whereof, each PARTY has caused this AGREEMENT to be executed by its duly authorized representatives:

LICENSOR:

By: _____

Typed Name: PHIL NEWMAN

Title: PRESIDENT

Date: 9/18/09

LICENSEE:

By: _____

Typed Name: _____

Title: _____

Date: 9/24/09

Page 14 of 15

EXHIBIT A

APPENDIX A - Patents & Patent Applications

U.S. Patent No.: **6,778,090**; Issued: **August 17, 2004**; Entitled: **Modular System for Monitoring the Presence of a Person Using a Variety of Sensing Devices**; Inventor/Patentee: **NEWHAM, Paul**

U.S. Patent No.: **6,297,738**; Issued: **October 2, 2001**; Entitled: **Modular System for Monitoring the Presence of a Person Using a Variety of Sensing Devices**; Inventor/Patentee: **NEWHAM, Paul**

U.S. Patent No.: **6,025,782**; Issued: **February 15, 2000**; Entitled: **Device for Monitoring the Presence of a Person Using Proximity Induced Dielectric Shift Sensing**; Inventor/Patentee: **NEWHAM, Paul**

U.S. Patent Application Serial No.: **12/362,539**; Filing Date: **January 30, 2009** [Claiming Priority to Multiple Prior Filed Provisional Patent Applications]; Entitled: **Modular Systems for Monitoring the Presence of a Person Using a Variety of Sensing Devices**; Inventor: **NEWHAM, Paul**

Canadian Patent No.: **2,264,805**; Effective Date: **September 4, 1997**; Entitled: **Device for Monitoring the Presence of a Person Using Proximity Induced Dielectric Shift Sensing**; Inventor/Patentee: **NEWHAM, Paul**

British Patent No.: **2,332,063**; Effective Date: **September 4, 1997**; Entitled: **Device for Monitoring the Presence of a Person Using Proximity Induced Dielectric Shift Sensing**; Inventor/Patentee: **NEWHAM, Paul** [for purposes of Non-Exclusive License]



## APPENDIX B -- Royalty-Base Products

**Royalty Base Products:**

> Sensor Mats (Bed-Ex Product No.: SENS 100-025) of Mylar® Material
> Sensor Mats (Bed-Ex Product No.: SENS 100-025 TYVEK) of Tyvek® Material

**Other (Non-Royalty-Base) Products covered by Licenses:**

> Connector Modules (CONNEX 2 Modules): (Bed-Ex Product Nos.: C-002 & C-002 R)

> Cord Sets (based on brand of connectable monitor) (Bed-Ex Product Nos.: C-30; C-30R; C-40; C-50; C-50R; C-60R; C-70; C-110R; C-120; C-80; C-90)





EXHIBIT A

## APPENDIX C – Practical Distribution Schedule

[LICENSEE shall use best efforts to initiate PRACTICAL DISTRIBUTION of the LICENSED INVENTION within three (3) months of the LICENSE COMMENCEMENT DATE and in accordance with the schedule set forth in the APPENDIX C to this AGREEMENT and incorporated into this AGREEMENT.]

(All time periods in days shall be considered in business days.)

| Event/Action | Date |
|---|---|
| **License Commencement Date** | LCD |
| Payment of License Fee by Licensee | LCD + 5 Days |
| Fully Executed Copies of Agreement to All Parties | LCD + 5 Days |
| Licensor Provides Licensee with Current Manufacturers Contact and Pricing Information | LCD + 5 Days |
| Licensee Issues P.O. for Available Existing Stock of Products from Licensor and/or Current Manufacturers. | LCD + 7 Days |
| Licensor Provides all Necessary Technical Specifications for Manufacture of Products | LCD + 7 Days |
| Licensor Ships Available Existing Product to Licensee per P.O. | LCD + 10 Days |
| Licensor Notifies Existing Distributors of 30 Day Transition | LCD + 10 Days |
| Licensee Places Initial Order(s) for Manufacture of New Product (As may be required by Sales & Inventory) | LCD + 30 Days (As Required) |
| Licensee Completes Production of Marketing Materials for Initial Distribution | LCD + 90 Days |
| Deadline for **Practical Distribution.** | LCD + 3 Months |



EXHIBIT A

## APPENDIX D – Schedule of Minimum Annual Royalties (MAR)

| Year of Agreement | Projected Sales | Minimum Annual Royalty (MAR) | Quarterly Payments (MAR) |
|---|---|---|---|
| First | 31,000 | $65,000 | $16,250.00 |
| Second | 60,000 | $125,000 | $31,250.00 |
| Third | 110,400 | $231,840 | $57,960.00 |
| Fourth | 138,000 | $289,800 | $72,450.00 |
| Fifth & Subsequent | 179,400 | $376,740 | $94,185.00 |

Note: Minimum Annual Royalties (MAR) are approximately calculated based on 70% of Projected Sales at $3.00 per unit Product sold.

EXHIBIT A

APPENDIX E – Existing Distributors

(1)     **Charts Plus**                              Howard Wigger, Owner
        11274 Old Maple Road                         Phone/Fax: (402) 496-6048
        Omaha, NE 68164

        Serves: North Dakota, South Dakota, Montana, Nebraska, Kansas


(2)     **The Parsons Group**                        Bill Parsons, Owner
        1002 Front Royal Drive                       Phone: (317) 938-5792
        Indianapolis, IN 46227                       Fax:    (317) 881-7038
                                                     E-mail: mrbill46@sbcglobal.net

        Serves: Indiana, Illinois (south) Kentucky (north)


(3)     **Vital-Med Systems, Inc.**                  Dave Campbell, Owner
        7022 South Revere Pkwy, Ste #200             Phone: (800) 388 3077
        Centennial, CO 80112                         Fax:    (303) 660 0019
                                                     E-mail: dcapbell@vitalmed.com

        Serves: Colorado, Arizona, Nevada, Utah


(4)     · Xytronics, Inc.                            Bill Nichols, President
        8001 Mainland Dr.                            Phone: (210) 521-5071
        San Antonio, TX 78250                        Fax:    (210) 680-2118
                                                     E-mail: billn@xytronics.com

        Serves: Medline Ind. Inc.

**Document scanned as
filed.**

EXHIBIT A